```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                     TAMPA DIVISION
```

LORI SHAMBLIN, individually
and on behalf of all others
similarly situated,

       Plaintiff,

                                    Case No. 8:13-cv-2428-T-33TBM

v.

OBAMA FOR AMERICA, DNC
SERVICES CORPORATION, and
NEW PARTNERS CONSULTING, INC.,

       Defendants.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendant DNC Services Corp.'s Motion for Summary Judgment (Doc. # 141), which was filed on November 7, 2014. Plaintiff Lori Shamblin filed a Response in Opposition to the Motion on December 8, 2014. (Doc. # 163). DNC Services filed a Reply (Doc. # 171) on December 22, 2014. For the reasons that follow, the Court denies the Motion.

**I.**    **Background**

Shamblin initiated this action by filing a putative class action against Obama for America on September 19, 2013, for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. (Doc. # 1). The TCPA makes it illegal to call any telephone number assigned to a cellular telephone service using an automatic-telephone-dialing system or an artificial or pre-

recorded voice. 47 U.S.C. § 227(b)(1)(A). Shamblin alleged that she received two unsolicited auto-dialed telephone calls "paid for by Obama for America" to her cellular telephone that left pre-recorded messages on her voicemail system. (Id. at ¶¶ 18-23).

On September 20, 2013, Shamblin filed a Motion to Certify Class Action. (Doc. # 5). This Court denied the Motion without prejudice on October 9, 2013, as the Motion was a placeholder devoid of the substantive factual and legal allegations necessary for this Court to engage in a Federal Rule of Civil Procedure 23 analysis. (Doc. # 13). Thereafter, on December 2, 2013, Obama for America filed its Motion to Dismiss and Motion to Strike Class Allegations, which the Court denied on February 18, 2014. (Doc. ## 31, 51).

On April 22, 2014, Shamblin timely sought leave to amend her Complaint to add DNC Services Corporation, also known as the Democratic National Committee, which the Court granted after holding a hearing. (Doc. ## 74, 86, 87). Thereafter, on August 14, 2014, Shamblin filed her Second Amended Complaint adding New Partners Consulting, Inc. as a Defendant pursuant to Rule 15(a)(2), Fed. R. Civ. P. (Doc. # 109).

In her Second Amended Complaint, Shamblin contends that "despite the prohibition of robocalls to cell phones, and the FCC's reminder that such calls are illegal, President Obama's principal campaign committee, defendant Obama for America, with the

2

assistance and participation of defendant DNC Services Corporation . . . and New Partners Consulting, Inc., called voter cell phones with both auto-dialed and pre-recorded calls urging the recipients to vote for Barack Obama in the 2012 presidential election." (Id. at ¶ 2). Shamblin alleges that Defendants violated the TCPA, "by calling voters' cell phones with auto-dialed calls and pre-recorded messages." (Id. at ¶ 21). Specifically, Shamblin contends, "beginning in September of 2012 and continuing up to the November 2012 election, Defendants initiated unsolicited auto-dialed telephone calls to plaintiff Shamblin's cellular telephone number. When plaintiff Shamblin did not answer the call, Defendants' pre-recorded message was left on her cellular telephone's voice mail system." (Id. at ¶ 22).

Shamblin "is informed and believes that the phone number was assigned to Organizing for America Florida, which was a project of the DNC that made and/or paid for calls using outside vendors such as New Partners Consulting, Inc." (Id. at ¶ 24). Shamblin further indicates that she "had not given Defendants her express consent to call her cell phone with automatically-dialed or pre-recorded messages. She had never given Defendants her telephone number and, prior to receiving Defendants' messages, had never even heard of Obama for America." (Id. at ¶ 25).

New Partners responded to the Second Amended Complaint on September 10, 2014, by filing an Answer and Affirmative Defenses.

3

(Doc. # 118). New Partners then filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) on September 25, 2014, alleging that it offered Shamblin full relief under Rule 68, Fed. R. Civ. P. (Doc. # 122). On November 5, 2014, this Court entered an Order denying the Motion. (Doc. # 139). Specifically, the Court held that:

> [B]ecause Shamblin did in fact seek to enjoin all the Defendants in this action, an Offer of Judgment without full injunctive relief diminishes the value of the judgment Shamblin seeks. Thus, the Offer of Judgment, which included injunctive relief only against New Partners Consulting, Inc., even if for the full monetary relief, does not encompass the entire value of the relief Shamblin seeks because it does not include an injunction against the other Defendant in this action.

(Id.). Simultaneously, this Court denied without prejudice Shamblin's Amended Motion for Class Certification. (Doc. # 140). Thereafter, New Partners served Shamblin with a second Rule 68, Fed. R. Civ. P., Offer of Judgment, and accordingly sought dismissal in a second motion to dismiss. (Doc. # 145 at 3). In an Order dated November 26, 2014, the Court denied New Partners second Motion to Dismiss. (Doc. # 156). The Court rejected New Partners' mootness arguments because its offers for judgment only addressed New Partners' conduct, and did not address Shamblin's requests for relief against the other Defendants. (Id.).

At this juncture, the Court is called upon to decide whether DNC Services is entitled to summary judgment.[1]

## II. Legal Standard

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

---

[1] In addition to DNC Services' Motion for Summary Judgment, other motions, including Shamblin's Motion for Class Certification, are pending before the Court. The Court will decide the remaining Motions via separate Order.

trial. Id. When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. Id.

"Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact and, therefore do not suffice to oppose a motion for summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997).

### III. FCC's Interpretation of the TCPA

The FCC is charged with implementing and regulating the TCPA. Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1117 (11th Cir. 2014). The FCC's construction in this regard is binding on this Court, and by virtue of the Hobbs Act, "Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals." Id. at 1113 (citing 28 U.S.C. § 2342). In two recent opinions, the FCC has explained the purpose of the TCPA and has defined the contours of liability for violations of the statute. In In re Dialing Services, LLC, 29 FCC Rcd. 5537 (2014), the FCC explained:

> In 1991, Congress passed the Telephone Consumer Protection Act (TCPA) that, in relevant part, outlawed robocalls to mobile phones except in two limited circumstances: calls made (1) for emergency purposes or (2) with express consent of the called party. While

6

> Congress recognized the transformative power of then-new technologies such as automated telephony, it likewise recognized that such power came with risks. Congress thus sought to address the growing number of consumer complaints by imposing greater restrictions on robocalls than on live calls: It is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by "live" persons. These automated calls cannot interact with the consumer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape or a voice recording service, and do not disconnect the line even after the customer hangs up the telephone.

Id. at 5537-38.

In Dialing Services, Dialing Services attempted to avoid liability for illegal robocalls to cellular telephones by "assert[ing] that it merely offer[ed] the transmittal services and serve[d] as a conduit that allow[ed] its clients to engage in robocalling, [essentially arguing] that it merely facilitate[d] illegal robocalling but d[id] not itself engage in the practice." Id. at 5542. The FCC disagreed with Dialing Services's "narrow interpretation of what the statute means by 'to make any call.'" Id. Referencing DISH Network LLC Declaratory Ruling, 28 FCC Rcd. 6574 (2013), the FCC explained in Dialing Services that both the entity that engages a telemarketer and the telemarketer so engaged may be liable for TCPA violations. Id.

Going into greater detail, the DISH Network opinion remarked that such liability could not be predicated upon tangential "but for" causation but, rather, "a person or entity 'initiates' a

7

telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call." 28 FCC Rcd. at 6583. The FCC expounded that, in addition to imposing liability on entities that "initiate" or "make" a robocall, vicarious liability for illegal robocalls may also be appropriate under common law agency principles. Id. at 6584.[2]

In this case, DNC Services seeks summary judgment and dismissal from the case under the theory that it did not initiate or make any calls to Shamblin and that there is no basis for holding DNC Services vicariously liable for calls that other entities, such as Obama for America, placed. Shamblin counters that DNC Services "made more than 19,000 robocalls to Florida voters cell phones" and that the robocalls Shamblin received were "initiated by the DNC through affirmative acts demonstrating sufficient involvement to meet the test for both direct and vicarious[] liability as defined by the TCPA." (Doc. # 163 at 1).

---

[2] The FCC has explained that the words "initiate" and "make" are used interchangeably in the TCPA. Dialing Services, 29 FCC Rcd. at 5542.

A. <u>Scope of Conduct Considered</u>

The Court notes that there is a pending motion for class certification in which Shamblin seeks certification of the following class: "All persons in Florida who received one or more non-emergency telephone calls from Defendants in September through November 2012 in support of President Obama's re-election to a cellular telephone through the use of an automatic-telephone-dialing system or an artificial or pre-recorded voice, and for whom Defendants' records do not show prior express consent for those calls." (Doc. # 146 at 1). However, at this procedural juncture, Shamblin is the sole Plaintiff in this action, and the only calls that the Court may consider in determining whether DNC Services violated the TCPA are calls made to Shamblin.

"The plaintiff's standing to bring an action against each defendant named in the Complaint must be established independently of Federal Rule of Civil Procedure 23." <u>Warnick v. DISH Network LLC</u>, No. 12-cv-1952, 2014 WL 2922660, at *9 (D. Colo. June 27, 2014)(quoting <u>Akerman v. Oryx Commc'ns, Inc.</u>, 609 F. Supp. 363, 377 (S.D.N.Y. 1984)). And, "a plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties. Bringing suit in the form of a class action does not abrogate the individualized standing requirement." <u>Hall v. Aetna Life Ins. Co.</u>, 759 F. Supp. 2d 1321, 1324 (N.D. Fla. 2010)(internal citations omitted). Thus,

the Court disregards and otherwise rejects Shamblin's argument that DNC Services is an appropriate defendant in this action based on calls it made individuals besides Shamblin, i.e. calls made to putative class members.

The Court will turn its attention to the issue of whether there is any basis for holding DNC Services directly or vicariously liable for the two robocalls which were undisputedly placed to Shamblin's cellular telephone.

### B. Direct Liability for Robocalls to Shamblin

In <u>DISH Network</u>, 28 FCC Rcd. at 6582, the FCC explained that, "a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer." <u>Id.</u>  The FCC clarified that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." <u>Id.</u> at 6583.

In <u>Dialing Services</u>, the FCC determined that the following conduct was evidence that Dialing Services "initiated" illegal robocalls to cellphones under the TCPA: (1) providing a software platform for making robocalls; (2) leasing or otherwise securing telephone connections for making robocalls; (3) purchasing voter lists; (4) providing technical support; (5) reviewing and/or editing messages; (6) reviewing phone numbers to determine if they are valid; (7) transmitting the calling party's number to be

displayed by the call recipient's caller identification services; (8) storing the prerecorded message on a server; (9) playing a recorded message to a called party; (10) detecting whether a call is answered by a live person or by an answering machine; (11) providing reports of call history, results, and polling; and (12) dialing telephone numbers. 29 FCC Rcd. at 5543-44. The FCC commented that these activities were "plainly within the understanding of 'making' or 'initiating' a call under the DISH Network standard." Id. at 5544-45.

Shamblin has pointed to evidence on file that a reasonable juror could rely upon to find that DNC Services initiated calls to Shamblin for the purpose of finding direct liability for illegal robocalls. For instance, the record shows that DNC Services provided voter information to Obama for America, reviewed telemarketing scripts, and also provided technical support. While this evidence is not overwhelming when it comes to proving DNC Services's direct involvement in the calls placed to Shamblin, it presents a genuine issue of material fact that precludes entry of summary judgment in favor of DNC Services on this issue. See also Md. v. Universal Elections, Inc., 729 F.3d 370, 375-80 (4th Cir. 2013)(defendants held directly liable under the TCPA for "creating" and "distributing" a message even though a third-party system actually relayed the calls.).

11

### C. Vicarious Liability for Robocalls to Shamblin

In addition to determining that a genuine issue of material fact remains for the jury's consideration on the issue of direct liability for TCPA violations, the Court also determines that summary judgment is not warranted on the issue of vicarious liability for TCPA violations.

The FCC has explained that vicarious liability may be predicated upon federal common law agency principles. DISH Network, 28 FCC Rcd. at 6586. Such principles include classical agency (where a principal manifests assent that an agent shall act on the principal's behalf and subject to the principal's control); apparent authority (where the principal is accountable for the results of a third-party's belief about the actor's authority to act as an agent when the belief is reasonable and traceable to a manifestation of the principal); and ratification (when a principal knowingly accepts the benefits of the actor's conduct). Id. at 6586-87. The FCC has specifically "reject[ed]" the argument that vicarious liability extends beyond these delineated agency principles in the context of the TCPA. Id. at 6585-86.[3]

Instructive to the Court's present analysis, the FCC has provided some examples of conduct "that may demonstrate that the

---

[3] The FCC further stated: "We find that the 'general common law' of agency-related principles, rather than the law of any particular State, should govern in construing the reach of the TCPA." 28 FCC Rcd. at 6587.

12

telemarketer is the seller's authorized representative with apparent authority to make the seller vicarious liability for the telemarketer's [TCPA] section 227(b) violations." Id. at 6592. Such examples include: (1) allowing access to "information and systems that normally would be within the seller's exclusive control;" (2) providing access to customer information; (3) allowing the third party to "enter consumer information into the seller's sales or customer systems;" (3) approving a telemarketing script; or (4) knowing of TCPA violations and failing to stop such violations. Id. at 6593-94.

However, in the Eleventh Circuit, the determination of whether an agency relationship exists is a question of fact, and "summary judgment on vicarious liability is appropriate only in cases where the evidence of the relationship is clear and unequivocal." Legg v. Voice Media Grp., Inc., 20 F. Supp. 3d 1370, 1378 (S.D. Fla. 2014)(denying plaintiff's motion for summary judgment on the issue of whether third party was vicariously liable for text messages transmitted by a telemarketer in violation of the TCPA); see also Johnson v. Unique Vacations, Inc., 498 F. App'x 892, 894 n.3 (11th Cir. 2012)("The existence of an agency relationship is one for the jury to decide as the triers of fact. The question can be resolved by summary judgment only in those cases where the evidence is capable of but one determination and there is no evidentiary question for the jury to resolve.").

13

In this case, Shamblin has pointed to evidence on file which creates a genuine issue of material fact for the jury to decide on the issue of whether an agency relationship existed between Obama for America and/or New Partners and DNC Services in connection with the calls placed to Shamblin's cell phone. Shamblin points to evidence that DNC Services reviewed and approved robocall scripts utilized by entities including Organizing for America and Obama for America. (Ritcheson Dep. Doc. # 163-5 at 33). Shamblin also claims that DNC Services was aware of TCPA violations and failed to prevent them. To this end, Shamblin filed an "FCC Enforcement Advisory" dated September 11, 2012, describing "an uptick in complaints" about illegal and "unwanted political messages being sent to consumers' mobile phones." (Doc. # 148-10). That FCC Enforcement Advisory contains detailed warnings about the requirements of the TCPA and indicates "Political Campaigns and Promoters are Reminded of Restrictions on Autodialed and Prerecorded Calls." (Id.).

Shamblin also identifies evidence that DNC Services controlled access to and use of the Voter File. According to Shamblin, DNC Services provided Shamblin's cellular telephone number to Obama for America, which led to her receiving two unsolicited robocalls in support of President Obama's re-election campaign. Specifically, Shamblin references the "Obama for America and Democratic National Committee Voter Data Exchange

14

Agreement," in which "DNC and OFA have agreed that DNC will provide OFA with access to the demographic and specialty data, voting history, issue and candidate preference fields and other personally identifiable information regarding individuals in the DNC's voter file database and consumer enhancements and other data collected by the DNC." (Doc. # 141-8 at 1). In addition, the Chief Operating Officer for Obama for America in 2011, Ann Marie Habershaw, described Obama for America's access to and use of the Voter File during her deposition. (Habershaw Dep. Doc. # 141-4 at 5). The depositions on file also suggest that Obama for America was authorized to add voter data and other information to the Voter file. (Id. at 3).

While the Voter Data Exchange Agreement between DNC Services and Obama for America contained a disclaimer of any principal/agent relationship, such a disclaimer is not dispositive of the issue of whether such a relationship was created. See Highline Capital Corp. v. Ahdoot, No. 06-cv-2024, 2008 U.S. Dist. LEXIS 12580, at *26 (D. Colo. Feb. 20, 2008)("courts routinely find such disclaimers only weakly probative of whether such [agency] relationships in fact exist."); Am. Home Mort. Corp. v. First Am. Title, No. 07-1257, 2007 U.S. Dist. LEXIS 83337, at *18 (D.N.J. Nov. 9, 2007)("If courts routinely recognized disclaimers of agency, parties could conduct themselves as principal and agent without legal ramifications that accompany that special relationship."). Despite

its disclaimer, the Court determines that the Voter Exchange Agreement is evidence that a finder of fact could use in support of a determination that an agency relationship arose in this TCPA case. See also Carr v. Stillwaters Dev. Co., L.P., 83 F. Supp. 2d 1269, 1280 (E.D. Ala. 1999)(denying a co-defendant's motion for summary judgment in an employment discrimination action on issue of whether an agency relationship was created even though the co-defendants' contract specifically disclaimed the formation of an agency relationship). After due consideration, the Court determines that an order granting summary judgment in favor of DNC Services on the issue of vicarious liability would invade the province of the jury. The Court accordingly denies the Motion.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

DNC Services Corp.'s Motion for Summary Judgment (Doc. # 141) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 17th day of April, 2015.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record